**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ASIAN AMERICANS ADVANCING JUSTICE-CHICAGO, CHANGE ILLINOIS, CHICAGO VOTES EDUCATION FUND, COMMON CAUSE ILLINOIS, ILLINOIS COALITION FOR IMMIGRANT AND REFUGEE RIGHTS, and ILLINOIS PUBLIC INTEREST RESEARCH GROUP EDUCATION FUND<br><br>              Plaintiffs,<br><br>v.<br><br>JESSE WHITE, in his official capacity as the Illinois Secretary of State, and ILLINOIS STATE BOARD OF ELECTIONS<br><br>              Defendants. | Case No. [_] |

## COMPLAINT

### NATURE OF THE ACTION

1.     Voting is a fundamental right in any democracy. In the United States, the first barrier to voting is voter registration. If citizens are not registered to vote, they cannot exercise their right to franchise. As such, any laws that assist with voter registration and make it more accessible must be fully and fairly implemented.

2.      When Illinois enacted Automatic Voter Registration[1] ("AVR" or the "AVR Statute") in 2017 with unanimous bipartisan support and endorsements from a diverse collection of more than 65 non-partisan organizations from around the state, Illinois was regarded as a leader in voter registration modernization.  The goal of the AVR Statute was to provide fair registration access to the over one million eligible but unregistered voters in Illinois while also improving the accuracy and security of the state's voter rolls.

3.      The passage of the law also signaled an opportunity to address longstanding racial disparities in voting access, as well as comparatively, low levels of voter registration and participation by young voters.  According to United States Census Bureau data, voter registration rates for Black, Latino, and Asian citizens lag behind the registration rate for White citizens in the state.[2]  These disparities are further exacerbated for citizens of color who are limited English proficient.  In passing the AVR law, Illinois government and community leaders recognized that automatic voter registration could narrow gaps in access to voter registration and increase civic engagement.

4.      Unfortunately, the promise of voter modernization and inclusivity has not only gone unfulfilled, it now appears that even basic voter registration services are mishandled in disregard of repeated calls for transparency and accountability by non-partisan organizations in the state.

---

[1] Illinois Public Act 100-464.

[2] *See* UNITED STATES CENSUS BUREAU, Voting and Registration in the Election of November 2018, *available at* https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-583.html; UNITED STATES CENSUS BUREAU, Voting and Registration in the Election of November 2016, *available at* https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-580.html.

5.     After the Illinois Secretary of State's Office (the "SOS") delayed implementation of the AVR Statute multiple times with no coherent explanation, in December 2018, Plaintiffs notified SOS and the Illinois State Board of Elections (the "SBOE") that the State was violating the voter registration rights of its citizens by willfully ignoring its obligations under the National Voter Registration Act (the "NVRA") and the AVR Statute. After nearly two years' worth of efforts to engage SOS and collaborate on proper implementation, and a subsequent notice letter identifying SOS's and SBOE's additional failures to comply with the NVRA, the Voting Rights Act (the "VRA"), and the AVR Statute— Plaintiffs can no longer keep waiting for Defendants to voluntarily comply with the law and to use a sound approach to AVR implementation. Defendants remain steadfast in their refusal to correct their failures—while Illinois citizens' fundamental right of access to the ballot is trampled upon. This action seeks to correct Defendants' wrongs and to ensure that those who wish to exercise their fundamental right to vote may do so.

6.     Defendants' failure to implement voter registration services that comply with the NVRA, the VRA, and the AVR Statute has caused a belief among Illinois citizens that the very people tasked with protecting their fundamental right to vote are missing opportunity after opportunity to correctly implement the law. Although Plaintiffs have tried to fill the void, in doing so, they are forced to expend their limited resources to ensure that voters are properly and timely registered. Defendants' violations require these organizations to divert resources away from their core activities, which include non-partisan voter registration and education and civic engagement efforts.

**JURISDICTION AND VENUE**

7. Plaintiffs bring this action under Section 11(b) of the NVRA, 52 U.S.C. § 20510(b), and Section 203 of the VRA, 52 U.S.C. § 10503, *et seq.* This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a), and 28 U.S.C. § 1367.

8. Defendants have received notice of these violations of federal law and have failed to correct the violations alleged here within the designated time frame. Plaintiffs therefore have a private right of action under 52 U.S.C. § 20510(b) to enforce the NVRA and may file suit after appropriate and timely notice pursuant to 52 U.S.C. § 20510(b)(2). Exhibit A contains the first notice provided to Defendants on December 13, 2018. Exhibit B contains the subsequent notice provided to Defendants on January 28, 2020.

9. This Court has personal jurisdiction over each Defendant because each is a citizen of the State of Illinois and each of the acts and omissions giving rise to this action occurred in Illinois.

10. Venue in this district is proper under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in this district, and each Defendant resides in and conducts business in this district.

**PARTIES**

11. Plaintiff Asian Americans Advancing Justice Chicago ("Advancing Justice-Chicago") is a non-profit organization with its principal place of business in Chicago, Illinois. Advancing Justice-Chicago is a grassroots, non-partisan organization building power in communities of color through civic engagement and voter registration, education, mobilization,

4

and advocacy. Advancing Justice-Chicago serves individuals of all ages including high school English learners, adult English learners, and at-large community members.

12.     Plaintiff CHANGE Illinois is a non-profit organization with its principal place of business in Chicago, Illinois. CHANGE (the Coalition for Honest and New Government Ethics) Illinois is a non-partisan organization advocating for government ethics, election and efficiency reforms. CHANGE Illinois works with Illinois residents to create a government that is transparent, accountable, and responsive to its constituents.

13.     Plaintiff Chicago Votes Education Fund ("Chicago Votes") is a non-profit organization with its principal place of business in Chicago, Illinois. Chicago Votes is a non-partisan organization whose mission is to build a more inclusive democracy. Chicago Votes prioritizes empowering and educating young Chicagoans and their initiatives are rooted in voter registration, voter education, and voter action.

14.     Plaintiff Common Cause Illinois is a non-profit organization with its principal place of business in Chicago, Illinois. Common Cause Illinois is a non-partisan, grassroots organization dedicated to fair elections and making government at all levels more democratic, open, and responsive to the interests of all people.

15.     Plaintiff Illinois Coalition for Immigrant and Refugee Rights ("ICIRR") is a non-profit organization, with its principal place of business in Chicago, Illinois. ICIRR is a grassroots, non-partisan organization building power in underrepresented immigrant and refugee communities through civic engagement and voter registration, mobilization, and advocacy.

16.     Plaintiff Illinois Public Interest Research Group Education Fund ("Illinois PIRG") is a non-profit organization with its principal place of business in Chicago, Illinois. Illinois PIRG is a nonpartisan group whose mission is to protect consumers and promote good government through investigating problems, crafting solutions, educating the public, and offering meaningful opportunities for civic participation.

17.     Plaintiffs constitute the steering committee of the Just Democracy Illinois coalition that sent the aforementioned notice letters, advocated for the passage of the AVR Statute, and has sought to serve as a resource regarding AVR implementation.

18.     Defendants are state officials charged with ensuring Illinois' compliance with 52 U.S.C. § 20504.  SBOE serves as Illinois' chief election officer.  Each state's chief election official is responsible for coordinating that state's compliance with the NVRA.  52 U.S.C. § 20509.

19.     Defendant Jesse White is the Illinois Secretary of State and is sued in his official capacity given the NVRA's requirements regarding voter registration through driver's license offices.  SOS is responsible for providing driver's license services in the state of Illinois.

20.     Additionally, SOS and SBOE are responsible for ensuring the State's compliance with AVR during relevant transactions through driver's license offices, which constitute a large proportion of voter registrations in the state and include opt-out registration (*see infra* ¶¶ 32-41), the cornerstone of the AVR Statute.

## APPLICABLE LAW

### *Section 5 of the NVRA*

21.     Congress enacted the NVRA "to establish procedures that will increase the number of eligible citizens who register to vote," and to increase access to this "fundamental right."  52 U.S.C. § 20501.  Under the NVRA, a state's chief election official is responsible for ensuring compliance with Section 5.  *See* 52 U.S.C. § 20509.

22.     Section 5 of the NVRA, 52 U.S.C. § 20504 *et seq.*, seeks to streamline the federal voter registration process, improve accessibility to voter registration, and increase the number of qualified voters properly registered.  *See, e.g.*, S. Rep. No. 103-6 (1993).

23.     Per Section 5 of the NVRA, each time an eligible Illinois applicant obtains, renews, or updates their driver's license or state-issued ID[3] (including submitting a change of address), the State must provide a simultaneous voter registration application.  52 U.S.C. § 20504(a)(1) & (d).[4]  In doing so, the State may not collect "duplicative" voter information, other than a second signature, which serves as an attestation of the applicant's voter eligibility. *See id* § 20504(c)(2).

24.     Voter registration processes that are complicated, redundant, or lengthy have been used throughout American history to exclude eligible voters of color from participating

---

[3] Pursuant to 52 U.S.C. § 20502(3), the NVRA defines a "motor vehicle driver's license" to "include[] any personal identification document issued by a State motor vehicle authority;" as such, hereinafter, any reference to a driver's license shall include a state personal identification card.  However, any reference to a driver's license in this complaint does not refer to a temporary visitor's driver's license.  It should be noted that the AVR Statute specifically excludes temporary visitor's driver's licenses.  *See* 10 ILCS 5/1A-16.1.

[4] Plaintiffs refer collectively to these driver's license transactions—application, renewal, and change of address—as "covered transactions" hereinafter.

*(cont'd)*

in elections and exercising political power.[5] The NVRA was enacted precisely to combat "discriminatory and unfair registration laws and procedures [that] can have a direct and damaging effect on voter participation . . . and disproportionately harm voter participation by various groups, including racial minorities." 52 U.S.C. § 20501(a)(3).

25.     The voter registration portion of the application shall also include a statement setting forth eligibility requirements for voter registration, as well as a statement informing the applicant that their declination to register to vote – or, if they registered to vote, the office where they registered to vote – will remain confidential. *Id.* § 20504(c)(2)(C); *id.* § 20504(c)(2)(D).

26.     Pursuant to Section 5 of the NVRA, a driver's license change of address shall automatically serve as an update to an individual's voter registration unless they decline such an update. 52 U.S.C. § 20504(d).

### Section 203 of the Voting Rights Act

27.     In 1975, Congress added Section 203 to the VRA's array of protections after recognizing the strong link between limited English proficiency and low voter participation, as well as the substantial language barriers that had been erected to discriminate against eligible voters based on national origin, educational level, and language ability. 52 U.S.C. § 10503(a).

28.     The purpose of Section 203 of the VRA is to provide limited English proficient citizens in covered jurisdictions with the same information and opportunities to participate in

---

[5] *See, e.g.*, CHRISTINA R. RIVERS, THE CONGRESSIONAL BLACK CAUCUS, MINORITY VOTING RIGHTS, AND THE U.S. SUPREME COURT (2014), pages 79-80 (describing racial discrimination that occurred even after the passage of the federal Voting Rights Act of 1965, which included subtly worded policies such as reregistration requirements that effectively and disproportionately purge minorities from voter registration rolls).

the electoral process as those in the electorate who speak English very well. In other words, every American citizen has the right to make an informed choice regarding voter registration and voting in the language that they are most comfortable speaking and reading.

29.     Pursuant to Section 203 of the VRA, covered jurisdictions must provide limited English proficient voters with translated voting materials including voter registration materials, ballots, voter guides, and websites maintained by election officials.  *Id.* § 10503(c) and (b)(3)(A).

30.     A jurisdiction is covered by Section 203 of the VRA if, *inter alia*, based on American Community Survey data that *first*, "more than 5 percent of the citizens of voting age of such State or political subdivision are members of a single language minority and are limited-English proficient" or "more than 10,000 of the citizens of voting age of such political subdivision are members of a single language minority and are limited-English proficient" and *second*, "the illiteracy rate of the citizens in the language minority as a group is higher than the national illiteracy rate." *Id.* § 10503(b).

31.     In Illinois, jurisdictions covered by Section 203 of the VRA include the City of Chicago and suburban Cook County for Spanish, Chinese, and Asian Indian[6] languages, as well as Kane and Lake Counties for Spanish. *See* Voting Rights Act Amendments of 2006, Determinations Under Section 203, 81 Fed. Reg. 87,532 (Dec. 5, 2016).

---

[6] Plaintiffs note that Asian Indian is not a language, and on information and belief, in 2012, election authorities in Chicago and suburban Cook County started providing written assistance in Hindi and oral assistance in Hindi, Urdu, and Gujarati after consultation with community members regarding compliance with Section 203 of the federal Voting Rights Act.

*Illinois AVR Statute*

32.     In 2017, Illinois enacted AVR with unanimous bipartisan support.  In enacting AVR, the Illinois' legislature sought to extend the protections of the NVRA and the VRA and improve the accuracy and security of elections.

33.     The AVR Statute was enacted in anticipation of the implementation of the REAL ID Act of 2005, 8 U.S.C. § 1101 *et seq.*  The REAL ID Act is a federal law that imposes additional requirements on governmental facilities issuing driver's licenses and identification cards.  The "opt out" part of the law, the cornerstone of the AVR Statute, registers eligible voters applying for, renewing, or updating a REAL ID driver's license, unless they decline to register to vote. 10 ILCS 5/1A-16.1(b).

34.     The AVR Statute sets forth different processes for REAL ID ("opt out" registration) and non-REAL ID ("opt in" registration) driver license transactions.   Both processes are described below.   The purpose of the AVR statute was to modernize and streamline all types of voter registration during driver's license transactions as well as through other designated agencies.

35.     The AVR Statute also prohibits the collection of "duplicative" voter information from a simultaneous voter registration applicant. 10 ILCS 5/1A-16.1(d). Pursuant to the AVR Statute, SOS is required to inform individuals whether they are currently registered to vote in Illinois, and if registered, at what address.  10 ILCS 5/1A-16.1(c).  Similarly, SOS must inform applicants about the qualifications to register to vote, the penalties for submitting a false voter registration, and the confidentiality of an applicant's decision to decline to register. 10 ILCS 5/1A-16.1(b-10).

36.     The AVR Statute also requires SOS to "review" the documents provided by an applicant to ensure the documents do not indicate that the applicant "does not satisfy the qualifications to register to vote. . ." 10 ILCS 5/1A-16.1(d). If identification documents do "indicate that [an applicant] does not satisfy the qualifications to register to vote in Illinois at his or her residence address, the application shall be marked as incomplete." 10 ILCS 5/1A-16.1(e).

*REAL ID Transactions*

37.     During REAL ID transactions, driver's license applicants are required to show documentation of lawful status.

38.     The AVR Statute requires that a person applying for a REAL ID-compliant driver's license who is a United States citizen and meets other qualifications to register to vote will be automatically registered to vote, unless that applicant opts out of being registered ("opt-out voter registration"). 10 ILCS 5/1A-16.1(b).

39.     The AVR Statute requires a dual-purpose, simultaneous application for a driver's license and voter registration, the applicant must "attest, by signature under penalty of perjury . . . to meeting the qualifications to register to vote in Illinois. . ." 10 ILCS 5/1A-16.1(b)(4). This "completed, signed application" then "constitute[s] a signed application to register to vote in Illinois" unless the applicant "affirmatively declined in the application to register to vote . . ." 10 ILCS 5/1A-16.1(e).

*Non-REAL ID Transactions*

40.     During non-REAL ID transactions, driver's license applicants are not required to show documentation of citizenship status.

11

41.    As such, the AVR Statute requires these applicants to (i) affirmatively choose to register to vote ("opt-in voter registration"), and (ii) attest under penalty of perjury to meeting voter registration eligibility requirements.  *See* 10 ILCS 5/1A-16.1(b-5).  Even after SOS started making REAL IDs available as an option, SOS continued providing non-REAL IDs through driver's license offices.  To this day, many driver's license applicants throughout Illinois still obtain non-REAL IDs and, in those transactions, applicants do not have access to opt-out voter registration.

## FACTUAL ALLEGATIONS

42.    The SOS is responsible for offering voter registrations during covered transactions for driver's licenses.

43.    The current process for offering voter registration during covered transactions as implemented by SOS personnel through driver's license offices violates the NVRA, the VRA, and the AVR Statute, and frustrates Illinois citizens' ability to register to vote.

44.    Upon an applicant's arrival at a SOS Driver Services Facility, a SOS employee completes a cursory check of the applicant's documents to ensure that they have sufficient paperwork to complete the desired transaction.  The applicant first signs an electronic pinpad confirming their name and date of birth.  Then, for applications other than change-of-address applications, the applicant proceeds to have their photo taken.

45.    The applicant then moves to a SOS computer station, where a SOS employee pulls up the applicant's new photo, name, date of birth, and gender.  The employee asks the applicant a series of questions and enters the applicant's answers into a form on the computer.

46.     REAL ID compliance requires the applicant to provide documentation indicating their citizenship status and other documentation showing their age or birthday.  *See* 6 C.F.R. § 37.11.  Therefore, for REAL ID transactions, the employee verifies in real time any documents brought by the applicant to fulfill the license or identification requirements.

47.     During a non-REAL ID transaction, there is no requirement to produce citizenship documentation.  But applicants may do so anyways.

48.     For both REAL ID and non-REAL ID applicants, the AVR Statute requires SOS personnel to review information provided by SBOE about whether the applicant is a registered voter in Illinois and, if registered, at what address.  Although the AVR Statute requires SOS personnel to inform all driver's license applicants about their voter registration status and registration address, on information and belief, they often do not do so.

49.     During REAL ID transactions, if an individual has shown documentation that they are a United States citizen and meets other qualifications to register to vote, and that individual is not registered to vote in Illinois, the SOS employee should be prompted by the computer system to state that the applicant will be automatically registered to vote unless they affirmatively opt-out.[7]  This is known as "opt out" voter registration where the default is to register individuals to vote.

50.     Similarly, during non-REAL ID transactions, if an individual has presented documentation showing that they are *not* a United States citizen, the SOS system should not

---

[7] As discussed *infra* ¶ 81, SOS has mistakenly sent SBOE information on a number of individuals who were labeled as having opted out of automatic voter registration.

*(cont'd)*

prompt for voter registration.[8] For those individuals who have not been screened out, SOS personnel should ask if they want to register to vote or update their voter registration. If the applicant says "yes," then the employee should direct the applicant to an electronic pinpad. The electronic pinpad poses two "yes" or "no" questions—*first,* whether the applicant will be at least 17 years of age by the next primary and 18 years of age by the next general election; and *second*, whether the applicant is a United States citizen. This is known as "opt-in" voter registration.

51.     On information and belief, the applicant is then shown a signature screen with the statement "I attest, by signature under penalty of perjury, that I meet the qualifications to register to vote in Illinois." This is the second signature for non-REAL ID applicants. The qualifications to register to vote in Illinois are not listed on the signature screen.

52.     The SOS system is not programmed to protect underage individuals from a proffer of voter registration. The electronic pinpad screen actually mistakenly suggests that some 16-year-olds are eligible to register, and the qualifications to register to vote are not shown on the screen. In other words, despite having date-of-birth information to screen out underage individuals who are too young to be eligible for voter registration, SOS does not do so.

53.     Then, for both REAL ID and non-REAL ID applicants, SOS personnel print out a paper version of the information related to the applicant's driver's license. For REAL ID applicants opting out of voter registration, as well as non-REAL ID applicants, there will

---

[8] However, SOS has mistakenly sent information on a number of non-citizen community members to SBOE who then sent them to local election authorities who improperly registered some non-citizens to vote.

be a section on the print-out entitled "Motor Voter." This section asks the individual to verify that the applicant was told about voter registration and asks the individual to confirm whether their voter registration is current.

54. Both REAL ID and non-REAL ID applicants must then sign a statement affirming that the information in the print-out is accurate. And for only REAL ID applicants who are not opting out of voter registration, this statement also includes an affirmation of the listed voter eligibility requirements. This is the third signature for non-REAL ID applicants and the second signature for REAL ID applicants registering to vote.

55. Defendants' delays and other actions hindered voter registration in the elections of November 2018, February 2019, and April 2019 and present an imminent threat of doing the same for the upcoming elections of March 2020 and November 2020. Research studies have shown that AVR markedly increases voter registration in big and small states, as well as states with different partisan makeups and states with different versions of AVR.[9]

56. Plaintiffs have received no response to their aforementioned notice letter sent to Defendants on January 28, 2020.

### *Defendants Do Not Provide Voter Registration to Recently Naturalized Citizens Obtaining Non-REAL IDs*

57. Illinois residents have experienced numerous ongoing problems in obtaining REAL IDs.[10] SOS has repeatedly turned away applicants who were seeking to obtain REAL

---

[9] KEVIN MORRIS & PETER DUNPHY, BRENNAN CENTER FOR JUSTICE, *AVR IMPACT ON STATE VOTER REGISTRATION* (Apr. 2019), https://www.brennancenter.org/sites/default/files/2019-08/Report_AVR_Impact_State_Voter_Registration.pdf.

[10] *See e.g.*, Stephanie Zimmermann, *Real ID? Real Pain in the Neck for Illinois Residents Trying To Get One,* Nov. 8, 2019*,* CHI. SUN-TIMES, https://chicago.suntimes.com/2019/11/8/20955723/real-id-drivers-license-long-lines-illinois-secretary-of-state.

*(cont'd)*

IDs, stated that applicants do not need a REAL ID, and stated that applicants have time before the REAL ID law goes into effect.[11] To this day, many driver's license applicants throughout Illinois still obtain non-REAL IDs and, in those transactions, applicants do not have access to opt-out voter registration.

58. During a renewal transaction for non-REAL ID driver's licenses, if an applicant has, since July of 2016, shown documents indicating non-citizenship, SOS's system fails to prompt the employee to ask about voter registration.[12] *Cf. supra* ¶ 50. That is the case *even if* the applicant has since become a naturalized citizen and as such *is* eligible to register to vote. This process is in clear violation of the NVRA and the AVR Statute's mandate that SOS provide all applicants with simultaneous voter registration services. Defendants' actions have a disproportionate impact on immigrant communities who already face barriers to voter registration. Citizens should not have a diminished opportunity to vote simply because they became citizens relatively recently. Nor should they face increased burdens in obtaining voter registration services that they are entitled to.

---

[11] *See id.* Additionally, on information and belief, a poster at Driver Services facilities states "You have time . . . . REAL ID does not go into effect until October 1, 2020," and "If you have a valid U.S. passport, you are NOT required to have a REAL ID to travel."

[12] It appears that the Driver Services software is programmed to automatically check a box stating that "I affirm that I was asked if I would like to apply to register to vote or update my voter registration address/name and I declined" for a whole cadre of Driver Services applicants who are not provided voter registration services, including currently registered voters, whether or not they actually declined. This troubling problem is discussed further *infra* in ¶ 62.

### *Defendants Do Not Provide Applicants with Required Information*

59.     Unlike REAL ID applications (*see supra* ¶ 54), non-REAL ID applicants under the SOS's current system are never presented with a voter attestation statement that lists voter eligibility requirements.  Defendants' failure to fully and meaningfully provide information regarding eligibility requirements and disclosures to those applicants is a violation of the NVRA's mandate that this information be provided to *every* applicant.

60.     And non-REAL ID applicants are not provided NVRA-mandated disclosures. These disclosures inform individuals that their decision to decline voter registration will remain confidential and if they do choose to register to vote, the office through which the applicant registered to vote will also remain confidential.

61.     SOS does not ensure that signage setting forth eligibility requirements and disclosures are visible during relevant transactions.

62.     Moreover, despite the AVR Statute's requirement that SOS personnel inform all driver's license applicants about their voter registration status and registration address, on information and belief, SOS personnel are not consistently informing applicants of their voter registration status.  Additionally, on information and belief, SOS personnel are not consistently asking applicants whether they want to register to vote.  For example, SOS personnel are, in at least some instances, giving individuals prepopulated Motor Voter paper forms with a checkmark next to the box stating, "I affirm that I was asked if I would like to register to vote or update my voter registration address/name and I declined" – but without having asked or mentioned anything to those individuals about voter registration.  Defendants' failure to

properly inform applicants of their registration status defeats the NVRA and the AVR Statute's primary purpose of ensuring easy and efficient voter registration.

63.     The implementation problems layered on top of each other create serious barriers to voter registration access.  For applicants who are turned away from getting a REAL ID and then do not receive required information about their voter registration status, voter eligibility requirements, and their rights to confidentiality, it becomes less and less feasible for voter registration to occur properly at a SOS driver's license office.  Lack of required information serves as a further barrier to voter registration for already marginalized communities, including recently naturalized citizens and citizens with past criminal records who are now eligible to vote.  Without proper information about voter eligibility and registration at SOS driver's license offices, community members who were previously legally excluded from voting are more prone to miss the opportunity to register to vote.

### *Defendants Do Not Automatically Update Voter Files for Changes of Address*

64.     Additionally, Defendants place a burden on individuals who submit a change of address for their driver's license.  Currently individuals submitting a change of address, whether they are registered to vote or not, are required to go through the full voter registration process, including providing additional signatures and a new attestation.

65.     Defendants' actions—by creating such an unnecessary burden—cause applicants to grow frustrated and abandon the process before SOS registers the applicant's new address.  As a result, applicants proceed into Election Day with the wrong voter registration address, thereby impinging on their ability to vote, in violation of the NVRA.

66. The failure to automatically update an already-registered voter's address threatens to have a disproportionate impact on particular communities who are more likely to be residentially mobile, such as communities of color, young people, and low-income community members. This violation, combined with SOS's failure to consistently inform applicants about their voter registration status means in practice that voters might be knocked off the voter rolls, miss the opportunity to register to vote, or have an incorrect voter registration address, causing avoidable problems during the election simply because they have moved.

### *Defendants Request Duplicative Information*

67. As discussed *supra* in paragraphs 44 and 50, during non-REAL ID transactions, SOS asks individuals in duplicate to verify their age in violation of the NVRA and the AVR Statute. And, despite repeatedly requesting information about an individual's age, SOS does nothing to protect age-ineligible applicants. SOS not only permits age-ineligible applicants to affirm that they meet the qualifications to register but also, for non-REAL ID applicants, SOS compounds the problem by not listing the qualifications to register to vote on the signature screen or the paper form associated with the process.

68. Furthermore, as discussed *supra* in paragraphs 51 and 54, during non-REAL ID transactions, SOS asks individuals registering to vote to provide signatures three different times.

69. As discussed *supra* in paragraph 54, during REAL ID transactions, SOS asks individuals registering to vote to provide signatures two times.

70. These duplicative requests by the SOS are in violation of the NVRA and the AVR Statute.

71. Moreover, as explained *infra* in paragraphs 81-82, even though SOS impermissibly requests duplicative information, it does not properly evaluate and transfer such information in accordance with the law.

### *Defendants Do Not Sufficiently Provide Voter Registration in Covered Languages*

72. According to the Census Bureau, pursuant to the 2016 American Community Survey, Cook County has 3,477,800 citizens of voting age, of whom 137,365 are limited-English proficient Spanish-speaking voting age citizens, 16,170 are limited-English proficient Chinese-speaking voting age citizens, and 13,590 are limited-English proficient voting age citizens who speak Hindi and South Asian languages.

73. According to the Census Bureau, pursuant to the 2016 American Community Survey, Kane County has 319,135 citizens of voting age, of whom 14,690 are limited-English proficient Spanish-speaking voting age citizens.

74. According to the Census Bureau, pursuant to the 2016 American Community Survey, Lake County has 456,090 citizens of voting age, of whom 11,605 are limited-English proficient Spanish-speaking voting age citizens.

75. Defendants provide and conduct voter registration during driver's license transactions in Cook, Kane, and Lake counties.

76. Under Section 203 of the Voting Right Act, voter registration in Cook, Kane, and Lake counties must be provided in covered languages. *See supra* ¶ 31.

77.     As discussed, for both REAL ID and non-REAL ID transactions, SOS personnel ask applicants questions orally relating to voter registration, such as if they want to register to vote or update their voter registration.  *See supra* ¶¶ 45, 48-50. These questions are not translated or interpreted in covered languages in the covered jurisdictions.

78.     Additionally, during non-REAL ID transactions, applicants are prompted to answer two questions on an electronic pinpad about their age and citizenship status.  These questions are not translated into covered languages in the covered jurisdictions.  On information and belief, applicants are then shown a signature screen with the statement "I attest, by signature under penalty of perjury, that I meet the qualifications to register to vote in Illinois." Again, this statement at the electronic pinpad is not translated into covered languages in the covered jurisdictions.

79.     Additionally, even for those signs pertaining to voter registration at driver license facilities that may have been translated, Defendants do not ensure that the signs are visible during relevant transactions.

80.     Defendants' failure to fully and comprehensively provide translations for voter registration during covered transactions for driver's licenses violates Section 203 of the Voting Rights Act.  Without language assistance, as well as clear and sound procedures as to how limited English proficient applicants will be treated, some citizens are being denied an equal opportunity to register to vote.  Furthermore, limited English proficient non-citizens are needlessly vulnerable at SOS driver's license offices, compounding the insufficient safeguards against inadvertent registration of non-citizens, discussed further *infra* in paragraphs 81-82.

**_Defendants Do Not Properly Evaluate and Transfer Relevant Information_**

81.　　Finally, SOS sends SBOE a data file of all voter registrations and address updates from that day or from the last few days.  However, it appears that SOS has not been carefully reviewing that information before transmitting it to the SBOE or carefully applying information regarding voter eligibility and identification documents.  Furthermore, SOS's Office also does not use robust design and testing procedures to safeguard against improper transfer of information.  SOS has mistakenly sent information on a number of non-citizen community members to SBOE who then sent them to local election authorities who improperly registered some non-citizens to vote.  SOS has also mistakenly sent to SBOE information for voter registration on a number of age-ineligible community members, such as 16-year-olds.  SOS has also mistakenly sent SBOE information on a number of individuals who were labeled as having opted out of automatic voter registration.

82.　　The failure to properly evaluate voter registration information and to transmit to SBOE relevant, accurate voter registration information is a violation of the NVRA and the AVR Statute and poses devastating consequences for many people of Illinois, particularly non-citizen community members and those who do not meet the age requirement to vote.  For the numerous people across Illinois who have since been notified by Defendants that they are not currently eligible to vote, even if they later become eligible to vote upon meeting the age requirement and becoming a United States citizen, Defendants' actions are likely causing a chilling effect on voter registration and voter participation.

*__Defendants' Conduct Injures Each Organizational Plaintiff__*

83.    Each Organizational Plaintiff is harmed by the State's failure to comply with the NVRA, the Voting Rights Act, and AVR.

84.    Advancing Justice-Chicago's mission is to build power through collective advocacy and organizing to achieve racial equity.  Advancing Justice-Chicago continually engages in non-partisan voter registration and mobilization throughout the Greater Chicago area.

85.    As a result of Defendants' actions, Advancing Justice-Chicago is forced to divert resources to voter registration and community education and information, rather than broader voter mobilization.  Further, Defendants' transgressions have forced Advancing Justice-Chicago to shift more resources to monitoring the State's compliance with AVR, preparing testimony for AVR implementation hearings, commenting on AVR implementation including proposed administrative rules, and identifying examples of improper registration procedures, for example lack of registration of eligible citizens and on the other hand improper methods to screen out noncitizens.

86.    Defendants' actions have also caused Advancing Justice-Chicago to devote significant staff time to working on education efforts, diverting the organization from its broader democracy reform work, as well as its initiatives on language justice, immigration, racial equity, and the Census.

87.    CHANGE Illinois is a civic organization that advocates for voter registration and mobilization, along with improved government ethics and efficiency.  CHANGE Illinois includes a diverse group of civic, philanthropic, business, labor, professional, and non-profit

organizations representing Illinoisans across the state. The organization is involved with efforts to educate citizens about their voting rights, encourage voter participation and turnout, and increase opportunities for improved ethics and greater civic engagement. As a result of Defendants' actions, CHANGE Illinois is forced to divert resources from its broader mission to advocate for government ethics, election, and efficiency reforms and has instead spent many hours adjusting how it advocates for voter registration. Further, Defendants' transgressions have forced CHANGE Illinois to shift more resources to monitoring the State's compliance with AVR, preparing testimony for AVR implementation hearings, commenting on AVR implementation including proposed administrative rules, and identifying examples of improper registration procedures.

88. Chicago Votes is a grassroots organization involved with voter registration, mobilization, and advocacy. The organization conducts voter registration and mobilization throughout Cook County for community members who are eligible to vote but not yet registered, including individuals who are in pretrial detention in Cook County Jail, as well as individuals in high schools and college campuses. The organization registered over two thousand eligible voters in Cook County Jail, has brought thousands of college and high school students to elections through Parade to the Polls and guided them through election day registration, and conducted other programs to inspire young people to become engaged in the political process.

89. As a result of Defendants' actions, Chicago Votes is forced to divert resources to voter registration that it otherwise would not have to but for Defendants' transgressions, including, but not limited to, voter registration in advance of elections in November of 2018,

February of 2019, April of 2019, and March of 2020.  Further, Defendants' transgressions have forced Chicago Votes to shift more resources to monitoring the State's compliance with AVR, preparing testimony for AVR implementation hearings, commenting on AVR implementation including proposed administrative rules, and identifying examples of improper registration procedures.

90.     Defendants' actions have also caused Chicago Votes to devote significant staff time away from its core initiatives such as engaging young community members in the criminal justice system through voter action and mobilization.

91.     Common Cause is a non-profit corporation organized and existing under the laws of the District of Columbia.  It is a nonpartisan democracy organization with over 1.2 million members and local organizations in 35 states, including Illinois. Common Cause Illinois is a membership-based organization that has long worked to expand voter registration, improve access to voting, and mobilize voters for civic engagement in their communities.

92.     As a result of Defendants' actions, Common Cause Illinois is forced to divert resources from its broader mission to hold power accountable through initiatives on voting rights, redistricting, money and influence in politics, and the 2020 Census.  Additionally, Common Cause Illinois has approximately 35,000 members who live and vote throughout the state of Illinois, many of whom are at risk of not having fair access to voter registration and not having their voter registration updated correctly, due to Defendants' actions.

93.     Additionally, Defendants' transgressions have forced Common Cause Illinois to shift more resources to monitoring the State's compliance with AVR, preparing testimony

for AVR implementation hearings, commenting on AVR implementation including proposed administrative rules, and identifying examples of improper registration procedures.

94. ICIRR is a grassroots nonpartisan, nonprofit organization building power in underrepresented immigrant and refugee communities through civic education, leadership development, and issue advocacy. ICIRR runs the New Americans Democracy Project (NADP), an initiative to promote civic participation in the immigrant communities of the Greater Chicago area. NADP conducts voter registration throughout the Greater Chicago area, with a particular focus on new citizens in immigrant communities. During and in the lead up to federal, state and local elections, NADP conducts get-out-the-vote efforts. Additionally, ICIRR conducts voter registration at naturalization ceremonies at United States Citizenship and Immigration Services and the federal courthouse.

95. As a result of Defendants' actions, there is a larger group of citizens who are eligible to vote but not yet registered, and ICIRR is forced to divert resources to register people to vote who would have been registered or had their voter registration address updated through the State's driver's license system, including, but not limited to, voter registration in advance of elections in November of 2018, February of 2019, April of 2019, and March of 2020.

96. Further, Defendants' transgressions have forced ICIRR to shift more resources to voter education and turnout-related contact with immigrant communities. More broadly, ICIRR is forced to divert resources to monitoring the State's compliance with AVR, preparing testimony for AVR implementation hearings, commenting on AVR implementation including proposed administrative rules, and identifying examples of improper registration procedures,

for example lack of registration of eligible citizens and on the other hand improper methods to screen out non-citizens.

97.     Defendants' actions have also caused ICIRR to divert significant staff time away from its initiatives on immigrants' rights, the Census, leadership development, and other activities to build power in underrepresented immigrant and refugee communities.

98.     Illinois PIRG is a grassroots organization with a mission of protecting consumers and promoting good government, and it conducts voter registration and mobilization of college and university students across the state.  Illinois PIRG engages in direct voter registration and mobilization work in the Greater Chicago area as well as other parts of Illinois.  As a result of Defendants' actions, Illinois PIRG is forced to divert resources to voter registration that it otherwise would not have to but for Defendants' transgressions, including, but not limited to, voter registration in advance of elections in November of 2018.

99.     Additionally, Defendants' transgressions have forced Illinois PIRG to shift more resources to monitoring the State's compliance with AVR, preparing testimony for AVR implementation hearings, commenting on AVR implementation including proposed administrative rules, and identifying examples of improper registration procedures.

100.     Defendants' actions have also caused Illinois PIRG to devote significant staff time away from its core consumer protection and good government initiatives through investigating problems, crafting solutions, educating the public, and offering meaningful opportunities for civic participation.

**CLAIM FOR RELIEF**

**Count I: Violation of Section 5 of the NVRA by Not Providing Voter Registration to Recently Naturalized Citizens**

101.    Plaintiffs incorporate herein all the paragraphs of this Complaint.

102.    As a consequence of their past and continuing failure to provide required voter registration services to recently naturalized citizens in non-REAL ID transactions, Defendants have violated, and continue to violate, Section 5 of the NVRA, 52 U.S.C. § 20504.

103.    The failure of Defendants to comply with Section 5 of the NVRA has injured and will continue to injure the Plaintiffs because Plaintiffs have been required to invest additional resources in voter registration and divert resources from other activities critical to their missions.  Curing these ongoing violations will permit Plaintiffs to allocate their scarce resources to other important activities.

104.    Plaintiffs are aggrieved by the Defendants' past and continuing violations of the NVRA and have no adequate remedy at law.  Declaratory and injunctive relief is required to remedy past and continuing violations of Section 5 and to ensure the Defendants' future compliance with the NVRA.

**Count II: Violation of Section 5 of the NVRA by Not Providing Required Information to Applicants**

105.    Plaintiffs incorporate herein all the paragraphs of this Complaint.

106.    As a consequence of their past and continuing failure to provide required voter registration services that include requisite disclosures and eligibility requirements, Defendants have violated, and continue to violate, Section 5 of the NVRA, 52 U.S.C. § 20504(c)(2)(C) and (D).

107.    The failure of Defendants to comply with Section 5 of the NVRA has injured and will continue to injure Plaintiffs because Plaintiffs have been required to invest additional resources in voter registration and voter education (including voter eligibility) and divert resources from other activities critical to their missions.  Curing these ongoing violations will permit Plaintiffs to allocate their scarce resources to other important activities.

108.    Plaintiffs are aggrieved by the Defendants' past and continuing violations of the NVRA and have no adequate remedy at law.  Declaratory and injunctive relief is required to remedy past and continuing violations of Section 5 of the NVRA and to ensure the Defendants' future compliance with the NVRA.

### Count III: Violation of Section 5 of the NVRA by Failing to Automatically Update Voter Files with Changes of Address

109.    Plaintiffs incorporate herein all the paragraphs of this Complaint.

110.    As a consequence of their past and continuing failure to automatically update voter registration information during change of address transactions, Defendants have violated, and continue to violate, Section 5 of the NVRA, 52 U.S.C. § 20504(d).

111.    The failure of Defendants to comply with Section 5 of the NVRA has injured and will continue to injure Plaintiffs because Plaintiffs have been required to invest additional resources in voter registration and divert resources from other activities critical to their missions.  Curing these ongoing violations will permit Plaintiffs to allocate their scarce resources to other important activities.

112.    Plaintiffs are aggrieved by the Defendants' past and continuing violations of the NVRA and have no adequate remedy at law.  Declaratory and injunctive relief is required to

remedy past and continuing violations of Section 5 of the NVRA and to ensure the Defendants' future compliance with the NVRA.

## Count IV: Violation of Section 5 of the NVRA by Requesting Duplicative Information for Non-REAL ID Transactions

113.    Plaintiffs incorporate herein all the paragraphs of this Complaint.

114.    As a consequence of their past and continuing failure to provide required voter registration services in a streamlined, simultaneous, and non-duplicative manner, Defendants have violated, and continue to violate, Section 5 of the NVRA, 52 U.S.C. § 20504.

115.    The failure of Defendants to comply with Section 5 of the NVRA has injured and will continue to injure the Plaintiffs because Plaintiffs have been required to invest additional resources in voter registration and divert resources from other activities critical to their missions.  Curing these ongoing violations will permit Plaintiffs to allocate their scarce resources to other important activities.

116.    Plaintiffs are aggrieved by the Defendants' past and continuing violations of the NVRA and have no adequate remedy at law.  Declaratory and injunctive relief is required to remedy past and continuing violations of Section 5 and to ensure the Defendants' future compliance with the NVRA.

## Count V: Violation of Section 203 of the Voting Rights Act

117.    Plaintiffs incorporate herein all the paragraphs of this Complaint.

118.    As a consequence of their past and continuing failure to provide required voter registration services in certain languages in Section 203-covered jurisdictions, Defendants have violated, and continue to violate, Section 203 of the VRA, 52 U.S.C. § 10503.

119.     The failure of Defendants to comply with Section 203 has injured and will continue to injure the Plaintiffs because Plaintiffs have been required to invest additional resources in voter registration and divert resources from other activities critical to their missions.  Curing these ongoing violations will permit Plaintiffs to allocate their scarce resources to other important activities.

120.     Plaintiffs are aggrieved by the Defendants' past and continuing violations of the VRA and have no adequate remedy at law.  Declaratory and injunctive relief is required to remedy past and continuing violations of Section 203 and to ensure the Defendants' future compliance with the VRA.

**Count VI: Violation of the AVR Statute by Not Informing Individuals About Their Voter Registration Status**

121.     Plaintiffs incorporate herein all the paragraphs of this Complaint.

122.     As a consequence of their past and continuing failure to inform individuals about their voter registration status, Defendants have violated, and continue to violate, the AVR Statute, 10 ILCS 5/1A-16.1(c).

123.     The failure of Defendants to comply with AVR has injured and will continue to injure the Plaintiffs because Plaintiffs have been required to invest additional resources in voter registration and divert resources from other activities critical to their missions.  Curing these ongoing violations will permit Plaintiffs to allocate their scarce resources to other important activities.

124.     Plaintiffs are aggrieved by the Defendants' past and continuing violations of AVR and have no adequate remedy at law.  Declaratory and injunctive relief is required to

remedy past and continuing violations of the AVR Statute and to ensure the Defendants' future compliance with the AVR Statute.

## Count VII: Violation of the AVR Statute by Not Properly Evaluating and Transferring Relevant Information

125.    Plaintiffs incorporate herein all the paragraphs of this Complaint.

126.    As a consequence of their past and continuing failure to properly assess and transfer information on age eligibility and citizenship information, Defendants have violated, and continue to violate, the AVR Statute, 10 ILCS 5/1A-16.1(d)-(f).

127.    The failure of Defendants to comply with AVR has injured and will continue to injure the Plaintiffs because Plaintiffs have been required to invest additional resources in voter registration and divert resources from other activities critical to their missions.  Curing these ongoing violations will permit Plaintiffs to allocate their scarce resources to other important activities.

128.    Plaintiffs are aggrieved by the Defendants' past and continuing violations of AVR and have no adequate remedy at law.  Declaratory and injunctive relief is required to remedy past and continuing violations of the AVR Statute and to ensure the Defendants' future compliance with the AVR Statute.

## Count VIII: Violation of the AVR Statute by Requesting Duplicative Information

129.    Plaintiffs incorporate herein all the paragraphs of this Complaint.

130.    As a consequence of their past and continuing failure to request duplicative information, including age and signatures, Defendants have violated, and continue to violate, the AVR Statute, 10 ILCS 5/1A-16.1(d).

131.    The failure of Defendants to comply with the AVR Statute has injured and will continue to injure the Plaintiffs because Plaintiffs have been required to invest additional resources in voter registration and divert resources from other activities critical to their missions.    Curing these ongoing violations will permit Plaintiffs to allocate their scarce resources to other important activities.

132.    Plaintiffs are aggrieved by the Defendants' past and continuing violations of AVR and have no adequate remedy at law.    Declaratory and injunctive relief is required to remedy past and continuing violations of the AVR Statute and to ensure the Defendants' future compliance with AVR.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

i.    Declare that the Defendants have violated, and are continuing to violate, Section 5 of the NVRA, Section 203 of the Voting Rights Act, and the AVR Statute, by failing to provide lawfully compliant voter registration opportunities;

ii.    Issue permanent injunctions ordering the Defendants, their officers, agents, employees, and successors in office, and all persons in active concert or participation with them, to develop, implement, and enforce practices and policies to ensure compliance with Section 5 of the NVRA, Section 203 of the VRA, and the AVR Statute, through the proper implementation of AVR voter registration;

iii.    Direct the Defendants, under a court-approved plan with appropriate mandatory reporting requirements and stakeholder monitoring, to take all actions necessary to remedy the

past and continuing violations to ensure that all persons affected by Defendants' violations are provided access to voter registration and the ballot in future elections;

iv.     Direct Defendants, under a court-approved plan with appropriate mandatory reporting and monitoring requirements, to take all actions necessary to ensure future compliance with the requirements of Section 5 of the NVRA, Section 203 of the VRA, and the AVR Statute, including, without limitation, to implement AVR-compliant practices and policies for offering compliant voter registration services to individuals engaging in all covered transactions;

v.     Award Plaintiffs reasonable attorneys' fees, litigation expenses, and costs incurred in connection with this action, pursuant to 52 U.S.C. § 20510(c);

vi.     Retain jurisdiction over this action to ensure that Defendants comply with any order(s) issued by this Court and with their obligations under the NVRA, VRA, and the AVR Statute; and

vii.     Grant such additional relief as this Court deems just and proper.


**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

Dated: February 28, 2020

Respectfully submitted,

/s/ Charles F. Smith
Charles F. Smith
Michael Tomczyk (admission pending)
Corbin Houston
155 North Wacker Drive
Chicago, IL 60606
Tel: 312.407.0700
charles.smith@skadden.com
michael.tomczyk@skadden.com
corbin.houston@skadden.com

Aneel Chablani
Ami Gandhi
Jennifer Terrell
CHICAGO LAWYERS' COMMITTEE FOR
CIVIL RIGHTS
100 N. LaSalle St., Suite 600
Chicago, IL 60602
Tel: 312.888.4193
achablani@clccrul.org
agandhi@clccrul.org
jterrell@clccrul.org

Niyati Shah (*pro hac vice* pending)
ASIAN AMERICANS ADVANCING
JUSTICE | AAJC
1620 L St., NW #1050
Washington, DC 20036
Tel: 202.296.2300
nshah@advancingjustice-aajc.org

*Counsel for Plaintiffs*